IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIJEL GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 10372 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JENNIFER ENCARNACION, JOSE | ) | |
| ENCARNACION, WENDY OLSEN- | ) | |
| FOXON, JOHNATHAN RUSSELL, | ) | |
| JULIE STEPHENS,[1] IMHOTEP | ) | |
| CARTER, and LATONYA WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff sues defendants pursuant to 42 U.S.C. § 1983 for their alleged deliberate indifference to his serious medical needs.[2] Defendants have filed motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the Court grants in part and denies in part the motions.

**Facts**

At the times relevant to this suit, plaintiff was an inmate at the Illinois Department of Corrections' ("IDOC's") Stateville facility and defendants Jennifer Encarnacion, Jose Encarnacion, Julie Stephens, Wendy Olsen-Foxon and Johnathan Russell (collectively, the "State Defendants")

---

[1]Julie Stephens is incorrectly sued as "Mrs. A. Stephens." (*See* Compl.)

[2]In his response to defendants' motions for summary judgment, plaintiff attempts, for the first time, to raise a retaliation claim. Because plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment," *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996), the Court does not address this claim.

worked there as a registered nurse, a correctional sergeant, a correctional officer, and medical technicians, respectively. (Pl.'s Resp. State Defs.' LR 56.1(a) Stmt. ¶¶ 1-7.) Defendants Imhotep Carter and LaTonya Williams ("Wexford Defendants") are a physician and physician's assistant, respectively, who were not employed by IDOC but provided health care services to Stateville inmates. (*Id.* ¶ 8; Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶¶ 1, 8-9.)

On November 16, 2010, plaintiff slipped on ice in the Stateville yard and injured his right thumb. (Pl.'s Resp. State Defs.' LR 56.1(a) Stmt. ¶ 9.)

After he fell, plaintiff asked defendant Stephens for medical attention, and she "responded using derogatory language and told him, among other things, she would write [him] a 'disciplinary ticket.'" (*Id.* ¶¶ 10-12, 14.)

A few minutes later, plaintiff says he asked defendant Olson-Foxon, one of the medical technicians assigned to his cell house, for medical care. (*Id.* ¶ 16.) She reportedly told him "she did not have 'time for' [him] and . . . was going to each [sic] lunch." (*Id.*)

As soon as he walked into his cell house, plaintiff saw the cell house commanding officer, defendant Jose Encarnacion, and asked him for medical care. (*Id.* ¶ 18.) Encarnacion refused to provide it, saying that plaintiff was "'always complaining about something and crying like a baby.'" (*Id.* ¶¶ 18-19 (quoting Compl.).)

Several hours later, plaintiff saw defendant Russell, who also refused to get plaintiff any medical help. (*Id.* ¶ 20.)

That evening, plaintiff submitted a written request for medical treatment for his thumb. (*Id.* ¶ 23.)

The next day, November 17, 2010, plaintiff was examined by a doctor, who ordered an x-ray of the thumb and prescribed pain medication and a splint for plaintiff. (*Id.* ¶ 30.)[3] The x-ray, which was taken the same day, showed that the thumb was fractured. (Pl.'s Ex. E, Med. Records IDOC 662.) Sometime after the x-ray, plaintiff received the splint. (State Defs.' Ex. B, Pl.'s Dep. at 27-28.) It is not clear whether he received the prescribed pain medication. It is undisputed, however, that at the time of his thumb injury, plaintiff was already taking pain medication for back and shoulder pain. (Pl.'s Resp. State Defs.' LR 56.1(a) Stmt. ¶ 33.)

Sometime after November 16, 2010, plaintiff: (1) saw defendant Jennifer Encarnacion three or four times and asked her for pain medication, which she refused to provide and told plaintiff (a) "You think you can write grievances and sue me and expect my help, no"; and (b) "You are of no concern to me and [it] is not my job to be your mother"; (2) complained about his thumb a few times to Russell, who variously told plaintiff (a) to speak to the medical technician assigned to his cell house, (b) "you think you can write grievances and sue me and expect my help, no," and (c) "I [would] never help you even if you were dying"; and (3) asked Jose Encarnacion for medical attention, which Encarnacion refused to provide, telling plaintiff, on one occasion: "No you cannot see any medical staff, you always complaining about one thing or another like a little bitch." (*Id.* ¶¶ 22, 25-26, 28 (quoting Compl. ¶ 59); Pl.'s Stmt. Add'l Facts ¶¶ 11, 13-14, 17-18.)

On November 19, 2010, plaintiff was sent to UIC for an MRI of his right shoulder, which he had injured in 2003 and was causing him pain. (*See* Pl.'s Ex. E, Med. Records at IDOC 552.)

---

[3]Because plaintiff did not respond to ¶ 30 of the State Defendants' LR 56.1(a) Statement, he is deemed to have admitted the facts asserted in it. *See* LR 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").

The MRI showed that plaintiff had "severe acromioclavicular joint osteoarthrosis," *i.e.*, arthritis of the joint between the collarbone and the top of the shoulder blade. *See* http://www.hopkinsmedicine.org/orthopaedic-surgery/specialty-areas/sports-medicine/conditions-we-treat/ac-joint-injury.html; http://www.ncbi.nlm.nih.gov/pubmed/18343323.

On January 3, 2011, defendant Williams examined plaintiff, who said his thumb hurt, he had difficulty bending it, and was out of pain medication. (Pl.'s Resp. State Defs.' LR 56.1(a) Stmt. ¶ 35.)[4] She prescribed pain medication for him and referred him to Dr. Ghosh, who was then Stateville's Medical Director. (*Id.* ¶ 36.)

On January 10, 2011, Dr. Ghosh examined plaintiff, who complained of decreased range of motion in his right shoulder. (*Id.* ¶ 37; *see* Pl.'s Ex E, Med. Records at IDOC 456.)[5] Ghosh prescribed pain medication, ordered an MRI of the shoulder, and referred plaintiff to an orthopedist. (Pl.'s Resp. State Defs.' LR 56.1(a) Stmt. ¶ 37.)

---

[4]The Court overrules plaintiff's objection to the facts asserted in this paragraph and others that rely on Williams' notes from plaintiff's medical records because: (1) evidence offered at summary judgment must be admissible in substance, not form, *see Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010); (2) Williams testified, albeit not in these words, that the records refreshed her recollection as to her treatment of plaintiff; and (3) plaintiff submits the same records as an exhibit to his response. (*See* State Defs.' Ex. H, Williams Dep. at 15; State Defs.' Ex. I, Med. Record at IDOC 426; Pl.'s Ex. E, Med. Records at IDOC 462.)

[5]The Court overrules plaintiff's objection to the facts asserted in this paragraph, which rely on Dr. Ghosh's notes from plaintiff's medical records because: (1) evidence offered at summary judgment must be admissible in substance not form, *see Wragg*, 604 F.3d at 466; (2) the notes state that they are "MD notes" and contain Dr. Ghosh's initials, and thus he could testify at trial as to his treatment of plaintiff as reflected in the notes; and (3) plaintiff submits the same document as an exhibit to his response. (*See* State Defs.' Ex. J, Med. Record IDOC at 420; Pl.'s Ex. E, Med. Records at IDOC 456.)

On March 21, 2011, the orthopedic referral request was approved. (Pl.'s Ex. E, Med. Records at IDOC 554.)

On April 18, 2011, Williams saw plaintiff for pain in his shoulders and thumb. (Pl.'s Resp. State Defs.' LR 56.1(a) Stmt. ¶ 38.) She prescribed pain medication and confirmed that plaintiff had an appointment with an orthopaedist on April 29, 2011. (*Id.*)

On April 29, 2011, plaintiff was examined by a UIC orthopaedist, who scheduled plaintiff for shoulder surgery, which was performed on July 12, 2011. (*See* Pl.'s Ex. E, Med. Records at IDOC 556, 566.)

In July 2011, plaintiff told Olson-Foxon he had pain in his shoulder, thumb and skin, but she refused to get medical care for him. (Pl.'s Stmt. Add'l Facts ¶ 9.)

On July 26, 2011, Carter examined plaintiff, renewed his pain medication prescription, and referred him for physical therapy ("PT"). (Pl.'s Ex. E, Med. Records at IDOC 476, 559.) Plaintiff had PT for his shoulder from August 2011 through January 2012. (*Id.* at IDOC 481-94, 497-98, 502-04, 506-07, 560, 567, 569, 571-72, 574.)

On August 9, 2011, a non-party medical technician saw plaintiff and noted that he had "a large hard lump that is painful . . . [when] touch[ed]" on his right shoulder. (*Id.* at IDOC 479.) The medical technician put plaintiff on the sick call for August 11. (*Id.*)

On August 11, 2011, Williams examined plaintiff and diagnosed the lump as a "lipoma," *i.e.*, "a slow-growing, [benign] fatty lump." (*Id.* at IDOC 480); *see* http://www.mayoclinic.org/diseases-conditions/lipoma/basics/definition/con-20024646.

5

On August 23, 2011, Williams again saw plaintiff, who complained that his right shoulder was swollen. (Pl.'s Ex. E, Med. Records at IDOC 483.) Williams ordered ice and heat packs for plaintiff and instructed him to return to the healthcare unit, if necessary. (*Id.*)

Sometime in August 2011, when plaintiff asked Jose Encarnacion to send him for unspecified medical treatment, Encarnacion refused, saying: "You remind me of a girl, you are too feminine to be locked up." (Pl.'s Stmt. Add'l Facts ¶ 12.)

On October 20, 2011, plaintiff was seen by a non-party nurse, complaining of "tender painful skin on [his face]," numbness in his right index finger, which he had previously injured, and a lump on his right shoulder blade. (Pl.'s Ex. E, Med. Records at IDOC 494.) The nurse gave him ointment for his face and referred him to sick call for his other complaints. (*Id.*)

During some of his PT sessions, plaintiff saw Dr. Carter and asked him to do something about the rash on plaintiff's face. (State Defs.' Ex. B, Pl.'s Dep. at 34.) Carter said "he [was] not spending . . . money on [plaintiff]," that he had "bigger problems," and plaintiff's "issues weren't . . . major problems." (*Id.*) At another unspecified time, Carter told plaintiff "[he] should either die or go home but [Carter] wasn't going to deal with [plaintiff] anymore." (*Id.* at 52.)

On October 31, 2011, plaintiff was again seen by medical personnel for the rash on his face, the lump on his back, and pain in his index finger. (Pl.'s Ex. E, Med. Records at IDOC 491.) He was given orders for a pain reliever and heat packs and referred to the Medical Director for the lipoma. (*Id.*)

On December 15, 2011, defendant Carter examined plaintiff and noted that he had "no visible facial rash," and a "small rt shoulder posterior seroma," *i.e.*, "a sterile collection of fluid

under the skin, usually at the site of a surgical incision," http://www.uofmmedicalcenter.org/healthlibrary/ Article/116838EN. Carter ordered a pain reliever and ice packs for plaintiff and instructed him to get skin lotion from the commissary. (*Id.* at IDOC 502.)

On February 2, 2012, plaintiff told a non-party medical technician that he was still having shoulder pain. (*Id.* at IDOC 509.) The medical technician scheduled plaintiff to see Carter in March. (*Id.*)

On February 27, 2012, plaintiff saw Williams, complaining of right shoulder pain. (*Id.* at IDOC 511.) She gave him a pain reliever and noted that he was scheduled to see Carter in March. (*Id.*)

On March 26, 2012, plaintiff saw Carter, who renewed plaintiff's prescription for a pain reliever, but noted that plaintiff's right shoulder "moves freely" and said there was "no medical indication for further intervention." (*Id.* at IDOC 512.)

On August 12, 2012, plaintiff was transferred to another IDOC facility. (Pl.'s Resp. State Defs.' LR 56.1(a) Stmt. ¶ 50.)

## **Discussion**

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*,

209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

To defeat defendants' motions on his § 1983 claims, plaintiff must offer evidence that they were deliberately indifferent to one of his objectively serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "An objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (per curiam) (quotations omitted). A defendant acted with deliberate indifference if "[he] was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Id.* A delay in treatment "may constitute deliberate indifference if [it] exacerbates the injury or unnecessarily prolongs an inmate's pain." *Myrick v. Anglin*, 496 F. App'x 670, 674 (7th Cir. 2012). To prevail on a delay-of-care claim, however, plaintiff "must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Finally, none of the defendants can be held liable under § 1983 unless he or she was personally involved in the allegedly wrongful conduct. *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005).

**State Defendants**

The State Defendants do not argue that plaintiff's medical conditions are not objectively serious, and they concede that the facts, viewed in plaintiff's favor, suggest that they delayed his receipt of medical treatment. (State Defs.' Mem. Supp. Mot. Summ. J. at 12 n.2; *see* Pl.'s Resp.

8

State Defs.' LR 56.1(a) Stmt. ¶¶ 14, 16, 18-19, 22, 25-26, 28; Pl.'s Add'l Facts ¶¶ 9, 11-14, 17-18.) But they contend that there is no medical evidence that suggests any delay was detrimental.

The Court disagrees. Though plaintiff does not offer expert testimony about the impact of the delay in treating his thumb, the Seventh Circuit has made it clear that such testimony is not required. *See Williams*, 491 F.3d at 715-16. Rather, as in *Williams*, "evidence of a plaintiff's diagnosis and treatment . . . is []sufficient if it . . . assist[s] the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him." *Id.* at 715. Viewed favorably to plaintiff, the record shows that, when he broke his thumb, he "felt pain at a level of nine or ten out of ten," he did not receive pain medication or a splint until the next day, at the earliest, and after receiving treatment his pain level decreased to a "five or six out of ten." (Pl.'s Stmt. Add'l Fact ¶ 5.) That is sufficient evidence to create a genuine issue as to whether the delay in treatment allegedly caused by the State Defendants was detrimental to plaintiff. *See Williams*, 491 F.3d at 716 ("[A] reasonable jury could have concluded from the medical records that the delay unnecessarily prolonged and exacerbated Williams' pain and unnecessarily prolonged his high blood pressure."). Thus, the Court denies the State Defendants' motion for summary judgment on the claim that they were deliberately indifferent to plaintiff's broken thumb.

The record is much less clear with respect to plaintiff's shoulder condition and rash. Plaintiff generally says that he told all of the State Defendants except Stephens about both conditions and asked them for medical attention. (*See* State Defs.' Ex. B, Pl. Dep. at 38-39, 71-72, 82, 85-87, Pl.'s Stmt. Add'l Facts ¶¶ 9, 12, 14, 18-19.) But he does not say when he asked each of them for help or when he actually received it. Moreover, he offers no medical evidence that suggests any delay in treatment exacerbated either condition or increased whatever pain the conditions caused him.

9

Absent such evidence, plaintiff has not created a triable issue as to whether any of the State Defendants was deliberately indifferent to his shoulder and skin conditions.

**Wexford Defendants**

The Wexford defendants contend that they are entitled to judgment as a matter of law on any deliberate indifference claim related to the initial treatment, *i.e.*, in November 2010, of plaintiff's broken thumb because they had no involvement in it. The Court agrees, and grants their motion with respect to any such claim.

The Wexford Defendants are also entitled to judgment on any claim related to plaintiff's post-November 2010 complaints of thumb pain. It is undisputed that each time Williams examined plaintiff for complaints of thumb pain, she prescribed pain relievers and referred him to a doctor. (*See* Pl.'s Resp. State Defs.' LR 56.1(a) ¶¶ 35-36, 38.) Further, there is no evidence that plaintiff ever complained to Carter about his thumb. Accordingly, the Court grants the Wexford Defendants' motion for summary judgment on any claim related to post-November 2010 thumb pain.

Plaintiff fares no better with his shoulder-related claims. It is undisputed that on August 9, 2011, a non-party medical technician noted that plaintiff had "a large hard lump [on his right shoulder] that is painful . . . [when] touch[ed]," and put him on sick call. (Pl.'s Ex. E, Med. Records at IDOC 479.) On August 11, Williams examined plaintiff and diagnosed the lump as a lipoma. (*Id.* at IDOC 480.) On August 23, Williams saw plaintiff again for shoulder pain, ordered ice and heat packs for plaintiff, and instructed him to return to the healthcare unit, if necessary. (*Id.* at IDOC

483.) In December, Carter examined plaintiff, noted that he had a seroma, and ordered a pain reliever and ice packs for him. (*Id.* at IDOC 502.) In February 2012, plaintiff saw Williams for shoulder pain, and she gave him a pain reliever and referred him to Carter. (*Id.* at IDOC 511.) In March 2012, plaintiff saw Carter, who renewed plaintiff's prescription for a pain reliever, but said there was "no medical indication for further intervention." (*Id.* at IDOC 512.) Rather than showing deliberate indifference, these facts show that Williams and Carter were attentive to plaintiff's shoulder complaints. Plaintiff may not believe that they treated his shoulder properly, but medical malpractice, if that is what it was, does not constitute deliberate indifference. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence, does not violate the Constitution."). Therefore, the Court grants the Wexford Defendants' motion with respect to plaintiff's shoulder claim.

That leaves plaintiff's rash claims. The Wexford Defendants assert that plaintiff's rash was not an objectively serious medical need (*see* Wexford Defs.' Mem, Supp. Mot. Summ. J. at 9-10), but they offer no evidence to support that assertion or to counter the medical notes that say plaintiff had a "dark butterfly rash [on his] face" and his testimony that the rash was painful and so itchy that he has scars from scratching it. (*See* Pl.'s Ex. E, Med. Records at IDOC 491; State Defs.' Ex. B, Pl.'s Dep. at 29-31.) While not overwhelming, that evidence is sufficient to create a triable issue as to whether the rash was an objectively serious medical need.

Moreover, the record suggests that both defendants knew about the rash and refused to provide treatment for it. (*See* State Defs.' Ex. B, Pl. Dep. at 31-34 (plaintiff testifying that he spoke to Williams "[m]ultiple times" and to Carter "every time [plaintiff] saw him" about getting treatment for his rash, to which Williams responded, "[Y]ou've got too many problems. We're tired of dealing

11

with you," and Carter responded, "[I am] not spending . . . money on [you]," I have "bigger problems," and plaintiff's "issues weren't . . . major problems.").) Accordingly, the Court denies the Wexford defendants' motion for summary judgment on this claim.

**Conclusion**

For the reasons set forth above, the Court grants in part and denies in part defendants' motions for summary judgment [98 & 103]. The State Defendants' motion is granted as to the claims related to plaintiff's shoulder and rash and denied as to the claims related to plaintiff's thumb. The Wexford Defendants' motion is granted as to the claims related to plaintiff's thumb and shoulder and denied as to the claims related to his rash. The parties are ordered to file their final pretrial order on or before October 16, 2015. A status hearing is set for October 20, 2015 at 9:30 a.m.

**SO ORDERED.**  ENTERED: September 8, 2015

_____
**JORGE L. ALONSO**
**United States District Judge**